UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ELSIE CROWELL,

                    Plaintiff,

      -against-

WAL-MART STORES, INC.,
WAL-MART STORES EAST, L.P., AND
WAL-MART SUPERCENTER STORE
#2547,

                    Defendant(s).
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: 3-22-12

**MEMORANDUM DECISION
AND ORDER**

10-Civ-01116 (GAY)

Plaintiff Elsie Crowell ("plaintiff" or "Crowell") commenced the instant action against defendant Wal-mart Stores, et al. ("Walmart"), alleging employment discrimination based upon age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* and the New York State Human Rights Law ("NYSHRL"), Executive Law § 290, *et seq.* Walmart moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP").[1] For the reasons that follow, Walmart's motion for summary judgment is granted and the complaint is dismissed.

## I. BACKGROUND

Plaintiff was employed by Walmart from 1996 through April 2009.[2] She began her employment in the Fishkill, New York store and transferred to the store in Monticello, New York when she was around fifty-eight years old. From about 1998

---

[1] This action is before me for all purposes on the consent of the parties, pursuant to 28 U.S.C. §636(c).
[2] Crowell also worked at Middletown, New York Walmart from approximately 1992 through 1995. (Crowell Dep. 32:21, attached as Ex. B to Certification of Francis V. Cook in Supp. of Defs.' Mot. for Summ. J.)

through and including April 11, 2009, she worked at the Monticello store. In July 2008, at the age of sixty-nine, she volunteered to become the Personnel Manager.

Upon their hire, employees at all Walmart stores ("Walmart Associates") attend an eight-hour orientation at which they receive training on Walmart's policies and procedures, including those relating to pay, dress code, attendance, "Coaching for Improvement,"[3] "Open Door Communications,"[4] the ADEA, harassment, discrimination and inappropriate conduct, and safety. (Def.'s Rule 56.1 Statement, ¶¶ 3, 4.) The new employees complete an Orientation Checklist and receive a copy of Walmart's Employee Handbook, which details the procedures for reporting and responding to harassment and discrimination.[5] (Id. ¶¶ 1, 5.) In addition, they are required to complete several computer-based learning courses during their tenure on such topics as "Inappropriate Behavior," Harassment, Diversity, Walmart's Three Basic Beliefs, Corporate Ethics, the Family and Medical Leave Act, the Americans with Disabilities Act, and safety procedures. Associates must take and pass exams after these courses. (Id. ¶¶ 7-9.)

On January 22, 2009, after she had transferred to the Personnel Manager position, Crowell received a Verbal Coaching for Improvement for not keying in an

---

[3] Walmart utilizes a system of progressive discipline for employees, beginning with the first level ("Verbal Coaching"), which is used to notify an Associate that his or her conduct does not meet expectations. The second level ("Written Coaching") involves more serious discussions and must be acknowledged by the Associate. Disciplinary procedures culminate in a third level ("Decision-Making Day Coaching" or "D-Day"), which is "an Associate's final opportunity to evaluate his or her behavior in view of Walmart's expectations prior to termination." After a D-Day is issued, the Associate is given a paid day off and upon his or her return, meets with a member of management to discuss an "Action Plan." (See Defs.' Rule 56.1 Statement, ¶¶ 24-29.)

[4] Walmart's Open Door Policy encourages employees to "bring suggestions, observations, problems, or concerns to the attention of any supervisor or manager without fear of retaliation." (Id. ¶17.)

[5] Walmart's Discrimination and Harassment Prevention Policy advises employees to report harassment or discrimination to any salaried member of management or to report the violation to Walmart's Ethics Hotline. (Id. ¶ 15.)

evaluation of an employee in a timely manner; the employee thus did not receive her pay raise. Two weeks later, on February 5, 2009, Crowell received a Written Coaching for Improvement because she failed to key in an associate's hours and the associate was therefore not paid. On February 10, 2009, Crowell requested and was granted a leave of absence, which was to last until March 10.[6] She returned instead in April 2009 and a few days later, requested and was granted another leave. Crowell states that she requested the leaves due to work stress caused by the coachings she had received and by the fact that the store manager did not speak to her for three months. (Crowell Dep. 78:17-23, 79:1-13.) Instead of taking the second leave, Crowell left her employment on April 11, 2009.

Crowell does not deny that Walmart has the national policies enunciated above; she asserts, however, that instead of employing these policies, the Monticello store "illegally implemented" other, cost-saving policies outlined in a memorandum ("Memo") she submits, entitled "Reviewing and Revising Wal-mart's Benefits Strategy."[7] (See Compl., Ex. A.) These cost-saving policies, Crowell contends, are crafted to "dissuad[e] older workers from coming to work so that Walmart can replace them with younger 'healthier' workers." (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. at 15;[8] see also Compl. ¶¶ 62-65.) As a result of the implementation of these policies, she claims, there was no Open Door Policy for employees over forty ("older employees"); the dress

---

[6] Crowell's complaint states that she took an approved medical leave for ninety days. However, the record otherwise indicates that her leave requested was from February through March 10, 2009. (See, e.g., Crowell Dep. 78:8-12, 131:16-21.)

[7] The "Memorandum to the Board of Directors," "published on the internet and experienced by the plaintiff[]," summarizes a purported analysis of "Wal-Mart's approach to benefits" undertaken by "a 15-person team" within Walmart, with the assistance of the consulting firm McKinsey & Company. The Memo's author is one Susan Chambers, who is otherwise unidentified in this litigation.

[8] Hereinafter Pl's Mem.

code requiring Associates to wear tan pants and a blue shirt was strictly enforced against the older employees while those employees under forty ("younger employees") violated the dress code without consequence; and older employees' conduct was routinely deemed "serious" when similar conduct by younger employees was not.  (See Pl.'s Rule 56.1 Statement ¶¶ 15, 16, 23, 24, 26, 28, 87.)  In addition, she alleges that Walmart repeatedly required older employees to perform physical maintenance work outside of their job duties while simultaneously assigning less demeaning tasks to younger workers; fired older employees who refused to perform the more demeaning tasks; failed to properly schedule required breaks throughout the day for older workers, but not younger workers; used lateness or absences of older employees as an opportunity to reprimand, demote or fire; and used D-Days as a pretext for firing older employees.  (See Compl. ¶¶ 83-85, 89-90.)

The complaint cites a number of disparaging comments allegedly directed at older workers.  Crowell alleges that she witnessed "defendants' employees, including co-manager Rob Sparks" ("Sparks"), make "discriminatory, disparaging old-age based remarks" to older employees, such as:

(a) "Why doesn't she retire?

(b) "Older people are slower at the registers because older people have bad backs"

(c) "That lazy ass just gotta go"

(d) "She shouldn't be here"

(e) "She's causing problems for everybody"

(Id. ¶ 88.)

4

Crowell asserts that as the Personnel Manager, she was well-positioned to witness these and other discriminatory acts of the defendant. For example, she states that management forced her to provide a list of all employees older than sixty-nine years. She also states that an assistant manager, Brad Middleton ("Middleton") told her that he had been instructed by the store manager, Constance Giordano ("Giordano") to fire approximately seven employees "because they were old," but to use lack of attendance as an excuse for these firings. (Id. ¶¶ 75-77.)

Crowell alleges that she witnessed management utilizing a computerized coding system for tracking absenteeism and that the "unapproved absence" label was assigned to older employees' days out of work "substantially more often" than it was assigned to younger employees' days out of work. In addition, she claims that Walmart hired younger applicants over more qualified, older applicants. (Id. ¶90.)

Finally, Crowell asserts that she did not voluntarily retire and was instead constructively discharged. (See id. 114-117.) She states that when she returned from her approved leave of absence, a "considerably younger" employee had been hired to permanently fill her position. Walmart management, she says, informed her that the only position available for her was as a cashier or as an attendant in the lawn and garden department. (Id. ¶ 113.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "[T]he movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."

<u>Goenaga v. March of Dimes Birth Defects Found.</u>, 51 F.3d 14, 18 (2d Cir. 1995).  If the moving party meets its burden, the burden shifts to the non-movant to present evidence sufficient to show that there is a genuine issue for trial.  See <u>Holcomb v. Iona Coll.</u>, 521 F.3d 130, 137 (2d Cir.2008).  The parties may satisfy their respective burdens by "citing to particular parts of materials in the record, including depositions, documents, . . . affidavits or declarations, . . . or other materials." Fed.R.Civ.P. 56(c)(1)(A).  When deciding a summary judgment motion, the court must resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion.  <u>McPherson v. Coombe</u>, 174 F.3d 276, 280 (2d Cir. 1999).  The question is whether, in light of the evidence, a rational jury could find in favor of the nonmoving party.  <u>Gallo v. Prudential Residential Servs., Ltd. Partnership</u>, 22 F.3d 1219, 1224 (2d Cir. 1994).

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," and that "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir.2001) (internal quotation omitted).  As in any other case, an employment discrimination plaintiff must do more than present conclusory allegations of discrimination; she must offer concrete particulars to substantiate her claim.  See <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 110 (2d Cir. 1997).  Courts must be aware of the fact, however, that "discrimination will seldom manifest itself overtly." <u>Bickerstaff v. Vassar Coll.</u>, 196 F.3d 435, 448 (2d Cir. 1999).  They must therefore "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation

6

and conjecture." Id. The ultimate question in deciding a summary judgment motion in a discrimination case "is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances." Id.

### III. THE ADEA

The ADEA states that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §623(a)(1). This protection applies to employees who are at least forty years old. 29 U.S.C. §631(a). Plaintiff asserts her ADEA and NYSHRL claims under disparate impact, disparate treatment and hostile work environment theories.[9]

#### A. Disparate Impact

"To state a prima facie case of disparate impact under the ADEA, a plaintiff must demonstrate (1) the occurrence of a facially neutral employment practice, and (2) a significantly adverse or disproportionate impact of a practice on a group of employees of age forty or above." Hogan v. Metromail, 167 F.Supp.2d 593, 595 (S.D.N.Y. 2001). Disparate impact claims suggest "practices that are fair in form, but discriminatory in operation." Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971).[10] "The rule that emerges from prior cases [in the Second Circuit] is that a prima facie case is made out by showing either a gross statistical disparity, or a statistically significant adverse impact coupled with other evidence of discrimination." Waisome v. Port Auth. of N.Y. & N.J.,

---

[9] Age discrimination suits brought under the NYSHRL are subject to the same analysis as claims brought under the ADEA. See Leibowitz v. Cornell University, 584 F.3d 487, 498 n.1 (2d Cir. 2009).
[10] Title VII claims are analyzed under the same legal framework as ADEA claims. See Austin v. Ford Models, Inc., 149 F.3d 148, 152 (2d Cir.1998).

948 F.2d 1370, 1375 (2d Cir.1991). "[S]tatistical disparities must be sufficiently substantial that they raise . . . an inference of causation." Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 995 (1988).

Here, the plaintiff claims that Walmart seeks to implement the 2006 Memo's purported goal of attracting a healthier workforce through discriminatory acts that "dissuade" older workers from "coming to work."[11] Walmart dissuades older workers from coming to work, she states, by assigning janitorial work (e.g., washing bathrooms, vacuuming, washing floors and washing garbage cans) only to them and not the younger staff; having grocery bag packers assist only the younger cashiers; and firing older workers four times as frequently as younger workers. (Pl.'s Mem. at 14-15.)

These alleged practices, however, are not neutral in their treatment of different groups, but rather, are intentionally discriminatory. As such, with these charges, the plaintiff appears to be asserting a disparate treatment, not a disparate impact claim. See Attard v. City of New York, No. 10-4224, 2011 WL 6225249 (2d Cir. 2011) (stating that a preference of disciplinary charges against older teachers is not a neutral practice, as required to state a claim of disparate impact). The only facially neutral practice alleged by Crowell comes from a one-line suggestion in the Memo that Walmart design all jobs to include some physical activity (e.g., all cashiers do some cart gathering).

---

[11] Plaintiff interprets the phrase "coming to work" literally, assuming that it applies to currently employed workers. (See Pl.'s Mem. at 14) (referring to the Memo and stating "[t]heir language in stating 'dissuade coming to work' clearly refers to current elderly staff because if they weren't employed yet, they wouldn't be 'coming to work.'") It is clear to the Court, though, that the phrase actually means "to become employed," and applies to potential Walmart applicants.

8

See Memo at 10.) While this single item could feasibly be seen as having an adverse impact on older workers, nowhere is it alleged that it even occurred.[12]

Even if plaintiff's claims did support a disparate impact claim, she has not offered any reliable statistical evidence that would raise an inference that Walmart's practices significantly or disproportionately impacted employees of age forty or above. Instead, she baldly asserts that the older workers at the Monticello store comprised ten percent of the workforce, but forty percent of the terminations. But, this contention is substantiated only by her own "beliefs" and not on records obtained from Walmart's personnel department or other such keeper of employee statistics.

Crowell makes a nearly identical statement about another Walmart store ("store #2637") run by defendant Wal-Mart Stores East, L.P., but her authority for the percentage of older employees fired, the "last page" of a letter written to the U.S. Equal Employment Opportunity Commission ("EEOC") regarding another employee, is also flawed. (See Pl.'s Mem., Ex. J.) To be sure, the last page of the letter includes the number of employees fired (and whether they were below or above forty) at Walmart store #2637 for a specific type of termination, dubbed "misconduct with coachings," over a two-year period. "Misconduct with coachings," though, is only one of thirteen Walmart categories of "Involuntary Termination." (See Walmart Exit Interview form, attached as Ex. 40 to Certification of Constance Giordano in Supp. of Defs.' Mot. for Summ. J.)

---

[12] Crowell's reliance on the Memo is misplaced. First, as defendants note, the plaintiff has not authenticated the Memo. While the author's name appears on the Memo and a paragraph within states that the Executive Benefits Steering Committee "enthusiastically" received the recommendations (see Memo at 2), there is no identifying information regarding the author, no certification of the document and no indication that the initiatives described therein were ever considered or implemented by Walmart.

9

Using the percentage calculated for one category of firings as the percentage for *all* firings is mathematically incorrect and misleading.

Finally, Crowell states that older workers were fired four times as frequently as younger employees and asserts that "at least twenty five members of defendants' workforce [in Monticello], all over the age of forty, were terminated or forced to resign since 2005 and were replaced by younger workers." When pressed during her deposition, however, Crowell stated that she had "no documentation from the personnel office," did not actually know how many people were terminated from the Monticello Walmart in each year from 2005 through 2008 and ultimately admitted that "[i]t would be a guesstimate on [her] part." (Crowell Dep. 104:5-25, 105:1-2.) Crowell has thus failed to meet her burden. Accordingly, defendants are entitled to summary judgment on this claim.

## B. Disparate Treatment

ADEA disparate-treatment claims are analyzed using the burden-shifting framework enunciated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of age discrimination by showing "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that the action occurred under circumstances giving rise to an inference of discrimination." <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 107 (2d Cir. 2010).

An actionable adverse employment action is a "materially adverse change in the terms and conditions of employment," such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of

10

benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir.2000) (citations and internal quotation marks omitted).

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." Interdonato v. Bae Systems, Inc., 16 Fed. App'x 25, 27 (2d Cir. 2001). To find that an employee's resignation amounted to a constructive discharge, the trier of fact must be satisfied that working conditions were "so difficult or so unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Id.

"The ADEA does not define adverse employment action solely in terms of job termination or reduced wages and benefits . . . . [L]ess flagrant reprisals by employers may indeed be adverse." Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997). Everyday workplace grievances, disappointments, and setbacks, however, do not constitute adverse employment actions. See La Grande v. DeCrescente Distrib. Co., 370 Fed. App'x 206, 211 (2d Cir.2010). "Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" Wanamaker, 108 F.3d at 466.

Here, Crowell has satisfied the first two elements of a prima facie case. That is, she is over forty years of age and it is undisputed that she was qualified for her position. As for claimed adverse employment actions, Crowell asserts: (1) she and other older employees were not afforded access to the Open Door Policy as were younger employees; (2) she and other older employees did not receive breaks properly spread

11

across her shift as younger workers did; (3) she and other older employees were more harshly disciplined than younger staff; (4) she and other older employees "suffered Monticello Management's decimation of the national Anti-Harassment Policy; (5) claims of harassment and discrimination toward her and other older employees were not investigated; (6) management strictly enforced the dress code only against older employees; and (7) she and other older employees suffered a hostile work environment.[13]  In addition, Crowell claims, she was "fired." (Pl.'s Mem. at 18, 19.)

The adverse employment actions claimed by Crowell are not supported by the record.  Neither the certification she submitted nor the ones submitted by the former plaintiffs in this action create any genuine issues of material fact that would support her claims.  Moreover, during her deposition testimony, Crowell does not indicate that she was constructively discharged or fired.  When questioned by defendants' counsel, "Did you retire voluntarily?" she answered, "Yes." (Crowell Dep. 93:10-11.)  As to why her position of Personnel Manager was not available to her when she returned from her leave, Crowell stated that "because [she] had two coachings, [she] was not allowed to have a title as department manager . . . ." (Crowell Dep. 94:2-3.)  Indeed, Crowell seemed more concerned that her former position was not advertised internally than she was about the job being filled by someone while she was out on leave. (See Crowell Dep. 132:4-8) (stating that "[t]his job position, albeit that I was not any longer the personnel manager, would have been posted internally.  That was not.  The job was never posted.  Never posted.  But, yet, the position was filled.").

---

[13] Since plaintiff asserts a hostile work environment claim separate from the allegation of hostile work environment included here, the Court will address it in the next section.  See Part III C. infra.

Simply stated, there is nothing in this record to suggest that Crowell's supervisors or Walmart management created working conditions that were so intolerable that they would have compelled a reasonable person in the same situation to retire. Nor is there anything to substantiate that Crowell suffered any of the other claimed adverse employment actions. Although the plaintiff receives the benefit of all factual inferences on a defendant's motion for summary judgment, she must point to some evidence in the record that creates a genuine issue of material fact. She may not rest solely on her assertions in the complaint. Here, since there is no genuine issue of material fact created by plaintiff's assertions, defendants' motion for summary judgment on this claim is granted.

### C. Hostile Work Environment

"To prevail on a hostile work environment claim under Title VII, a plaintiff must demonstrate: (1) that [his] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation and citation omitted). "The conduct alleged must be severe and pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" Id. (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993).

In determining whether a plaintiff has established that the alleged misconduct was sufficiently severe or pervasive so as to have altered the workplace, courts will weigh the totality of the circumstances and consider various factors, including "the

13

frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.

To support her claim of a hostile work environment, Crowell reiterates her assertion that age-based discrimination and harassment occurred through enforcement of the Open Door, dress code and other policies one way for those employees under forty and another for those over forty. Again, however, Crowell offers no support for her generalized statements, except to say that she witnessed several specific discriminatory acts. Her allegations, however, were contradicted by her deposition testimony. When questioned about her contention, for example, that only the older cashiers were assigned to registers not equipped with portable bar code scanners and as a result, only the older cashiers were required to lift heavy items, such as bags of dog food, to scan them (see Compl. ¶44), she acknowledged that cashiers were not, in fact, assigned to specific registers. Her allegation, she stated, stemmed from what she "saw"—that the elderly cashiers "went down" to the registers that required heavy lifting "quite a bit." (Crowell Dep. 124:5-25, 125:6-20.) Similarly, when asked about her allegation that older workers were fired for refusing to do heavy maintenance or janitorial work (see Compl. ¶84), she admitted that she didn't know anyone who was ever fired for "refusing to wash toilets or do manual labor."[14] (Crowell Dep. 129:17-20.)

---

[14] These are not the only inconsistencies between Crowell's allegations and her deposition testimony. When pressed about her allegation that she witnessed management assigning unapproved absences "substantially more often" to older workers than younger workers, she admitted that she based her statement on watching them "work on the computer." (Crowell Dep. 101:1-3.) When asked what basis she had for alleging that socializing was discouraged for older employees, but sexual relationships between younger employees were deliberately encouraged (see Compl. ¶ 92), she stated, "I have no basis for that. I don't know how sexual relations come into play here." (Crowell Dep.119:13-18.)

14

Crowell's assertion, that store manager Giordano's directive to assistant manager Middleton—to fire five people because they "are old"—contributed to a hostile work environment is unavailing. For one thing, the statement is inadmissible hearsay. See, e.g., Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999) (In ADA action, plaintiff's "statement as to what he 'was told' was hearsay that would not be admissible at a trial. Since he presented no sworn statement from [the declarant], he failed to adduce any evidence sufficient to create a genuine issue to be tried . . . ."). While a party may rely on inadmissible hearsay to oppose a motion for summary judgment upon a showing that the evidence will be available at trial, see Burlington Coat Factory v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir.1985), Crowell makes no such showing here. Even if she had, given that she does not put forth any other evidence supporting her hostile work environment charge, this statement would need to stand on its own in creating a hostile work environment.[15] It does not.

Since the Court finds that the conduct alleged by plaintiff did not permeate the workplace with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, it need not reach the second element of a hostile work environment claim—whether such conduct can be imputed to the defendant. Accordingly, summary judgment is granted on this issue.

---

[15] Although not argued in her brief in opposition, Crowell's allegation regarding the remarks made by "Sparks and other employees to older employees, including Levine" is equally unavailing. When plaintiff's counsel deposed former co-plaintiff Levine, he did not ask her if Sparks or other Walmart employees had ever made such statements to her. When he asked her if it was her belief that persons over the age of forty were subjected to age-related discriminatory ridicule, she responded, "Ridicule, yes. Ridicule, yes. . . . Age-related? I can't say that." (Levine Dep.: 243:23-25, 244:1-16, attached as Ex. G. to Certification of Francis V. Cook in Supp. of Defs' Mot. for Summ J.)

## V. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED. The Clerk of the Court is respectfully requested to terminate the pending motion (Docket #42) and enter judgment accordingly.

Dated:  March 2̲2̲ 2012        **SO ORDERED**:
        White Plains, New York

_____
GEORGE A. YANTHIS, U.S.M.J.